**In The Matter Of AMINEX CORPORATION, et al., Debtors.**

**Bankruptcy Nos. 78 B 491, 78 B 768, 78 B 769, 78 B 770, 78 B 772 to 78 B 774, 78 B 777 to 78 B 782, 78 B 1423 and 78 B 1424.**

United States Bankruptcy Court, S. D. New York.

Sept. 23, 1981.

Patterson, Belknap, Webb & Tyler, New York City, for Receiver; Robert Egan, Joel L. Carr, Jeffrey Sabin, David Dykhouse, New York City, of counsel.

Harold R. Tyler, Jr., New York City, Receiver.

Angel & Frankel, New York City, for Creditors Committee; Eric S. Brown, New York City, of counsel.

Moses & Singer, New York City, for Andrew Adams and Edward Clemons; Robert Rosenberg, New York City, of counsel.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for Ernst & Whinney; Jeffrey D. Fields, New York City, of counsel.

Whitman & Ransom, New York City, for debtors; Howard Berman, New York City, of counsel.

Fulbright & Jaworski, Houston, Tex., for Kaneb Services, Inc.; D. Jansing Baker, Houston, Tex., of counsel.

Greenbaum, Doll & McDonald, Lexington, Ky., Sp. Counsel, to the Debtors; Robert C. Stilz, Jr., Lexington, Ky., of counsel.

## OPINION AND ORDER

JOEL LEWITTES, Bankruptcy Judge.

Aminex Resources Corporation ("Aminex") filed its Chapter XI petition in this Court on March 22, 1978. Prior to that filing, Aminex and its subsidiaries were defendants in a civil injunctive proceeding in the United States District Court for the District of Columbia wherein the Securities and Exchange Commission alleged that certain officers, as well as the controlling shareholder of Aminex, had looted and defrauded the Company of at least $1.24 million dollars and had violated several provisions of the Securities and Exchange Act of 1934 and Rule 10b–5. That court granted

the SEC's request for injunctive relief and Rudolph W. Guiliani was appointed as the substituted temporary receiver of Aminex and its subsidiaries. The District of Columbia's injunctive order was vacated upon the Chapter XI filings of the debtors here.[1] On April 28, 1978 each of the debtors other than Aminex, Bituminous-Laurel Mining, Inc. ("Bituminous") and New Bush Creek Mining, Inc. ("New Bush"), filed Chapter XI petitions for arrangement and on August 4, 1978, Bituminous and New Bush each filed Chapter XI petitions in this Court.

In accordance with the then-existing local bankruptcy rules of this District,[2] upon applications to the District Court, District Judge Lloyd F. MacMahon appointed Mr. Guiliani, the District of Columbia temporary receiver, as receiver of the captioned Chapter XI debtors.

When the petitions in these Chapter XI cases[3] were filed, there was scarcely any reason to believe that the debtors would survive. There was available, at the time of filing, only $199 in cash. Moreover, there were claims by limited partnerships that they owned the coal being mined by the debtors, an alleged breach by the debtors of their contract to sell coal to Dayton Power and Light Company, a strike declared by the miners employed by the debtors, and the voracious appetite of accounts receivable financing that was sapping the debtors of any available cash due them.

Today, three and one-half years later, these Chapter XI cases have been confirmed[4], the total assets of the estate amount to $20.9 million dollars and the plans, as confirmed, provide for a one-hundred percent payment to creditors. The professionals, who have toiled in that successful endeavour, now seek compensation for their labors.

On July 14, 1981 this Court held a hearing on the several applications for allowances.

A

*The Receiver and Successor Receiver*

■ Mr. Rudolph W. Guiliani, as just noted, was appointed by the District Court as receiver of the several Chapter XI debtors here.[5] On March 20, 1981, Mr. Guiliani tendered his resignation as receiver upon his nomination to the post of Associate Attorney General of the United States. By order dated March 30, 1981, the District Court appointed[6] as successor receiver, Ha-

---

1. Bankruptcy Rule 11-44, 415 U.S. 1033, 94 S.Ct. 3255, provides, *inter alia*, that the filing of a Chapter XI petition "shall operate as a stay of the... continuation of any court or other proceeding against the debtor, or the enforcement of any judgment against him...."

2. Local Bankruptcy Rule, Southern District of New York R. 8(a) (repealed Dec. 17, 1979). *Cf. In re Premier Floor Covering Co., Inc.*, 35 F.Supp. 901 (E.D.N.Y.1940).

3. These debtors were consolidated, *procedurally* by orders of this Court. This joint administration of the estates of these debtors, under Bankruptcy Rule 117(b)(4), 411 U.S. 1015, is to be distinguished from a *substantive* consolidation. See Advisory Committee's note to Bankruptcy Rule 117. Bankruptcy Rule 117(b), *inter alia*, applies to Chapter XI cases. See Bankruptcy Rule 11-14, 415 U.S. 1015, 94 S.Ct. 3242. For the requirements of substantive consolidation see *e. g. Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966); *In re Flora Mir Candy Corp.*, 432 F.2d 1060, 1062–3 (2d Cir. 1970).

4. In accordance with the teachings of our Court of Appeals in *Technical Color & Chemical Works, Inc. v. Two Guys From Massapequa, Inc.*, 327 F.2d 737, 739 (2d Cir. 1964) a full evidentiary hearing was held by this Court, on June 9, 1981, where, upon the evidence adduced, it was determined that the debtors fulfilled all the statutory requirements for confirmation.

5. See note 2, *supra*.

   Mr. Guiliani was appointed receiver of Aminex by order dated March 24, 1978. He was appointed receiver of each of the debtors other than Aminex, Bituminous and New Bush, by order dated April 28, 1978, and was appointed receiver of the latter two named entities on August 4, 1978.

6. Although this Court unqualifiedly concurs in the choice of Judge Tyler as receiver, we are not at all satisfied that the application for a successor receiver was properly made to the District Court, since local rule 8(a), n.2, *supra*, was abrogated by the Judges of the District Court on December 17, 1979.

rold R. Tyler, Jr., a respected and learned former Judge of the District Court and former Deputy Attorney General of the United States.

Bankruptcy Act § 48(a)[7] defines, *inter alia*, the ceiling to a receiver's commissions; that section does not prohibit an award below the statutory maximum amount depending upon "the unique fact situation of each case...."[8]

Quite recently, this Court echoed the criteria to be applied to an application for commissions by a bankruptcy court receiver.[9] This Court is of the opinion, based upon its knowledge of the effective performance by the original receiver and his successor,[10] that these "operating receivers"[11] fulfilled their assigned tasks in an exemplary manner. Both the estate and its creditors are the direct beneficiaries of their superior efforts.

The receiver and successor receiver request commissions in the total amount of $240,930. Interim allowances of $176,189.09 have heretofore been granted. The prede-

cessor receiver now seeks allowances of his remaining commissions in the amount of $63,290.42 and his successor requests remaining commissions in the total of $1,450.50[12].

It appears that the total request of the operating receiver and successor receiver amounts to less than 13% of the outer limits mandated by statute. In applying the relevant criteria to this application, we award, as final commissions here, $240,000 and $34.56 for out-of-pocket disbursements.

## B

### Counsel to the Receiver

▮ Patterson, Belknap, Webb & Tyler, Esqs. ("Patterson, Belknap") were retained by the receiver and his successor to act as their counsel in these Chapter XI cases. To date, Patterson Belknap has been awarded, as interim compensation, $1,689,469 or 75% of their requested fees for professional services.[13] They now seek the remaining

---

It should be noted that Bankruptcy Rule 201(a), 411 U.S. 1020, 93 S.Ct. 3112, provides that "the *Court* may appoint a receiver when necessary in the best interest of the estate." (emphasis supplied). The Bankruptcy Act of 1898 defined the "Court" to mean "the judge or the referee of the court of bankruptcy...". Bankruptcy Act § 1(9), 11 U.S.C. § 1(9) (repealed). But Bankruptcy Rule 102(a), 411 U.S. 1003, 93 S.Ct. 3100, provides for automatic reference to a referee and, in my view, upon the abrogation of local rule 8(a), this Court was the proper forum to which an application for a receiver should have been addressed.

**7.** 11 U.S.C. § 76 (repealed). These Chapter XI cases, of course, are governed by the terms of the now repealed Bankruptcy Act of 1898. See Bankruptcy Reform Act of 1978 § 403(a). To be sure, the 1978 Bankruptcy Code, § 105(b), 11 U.S.C. § 105(b), specifically denies to the bankruptcy court the power to appoint a receiver. The concept of a receiver in bankruptcy was considered by the Congress to be outdated. See H.R.Rep. No. 595, 95th Cong., 1st Sess. 316 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 29 (1978), U.S.Code Cong. & Admin. News 1978, p. 5787.

**8.** *Cf. S. E. C. v. W. L. Moody & Co.*, Bank., 374 F.Supp. 465, 480 (S.D.Tex.1974), *aff'd without opinion*, 519 F.2d 1087 (5th Cir. 1975) (S.E.C. civil injunction proceeding).

**9.** See *Matter of D. H. Overmyer Co., Inc.*, 3 B.R. 678, 684 (Bkrtcy.S.D.N.Y.1980) (Bankruptcy Court).

**10.** In addition to the oral reports given at the statutory hearings held during the course of these Chapter XI cases, the docket sheets and my personal worksheets, the receiver and his successor have filed thirty-eight (38) monthly reports of joint administration.

**11.** Pursuant to the terms of Bankruptcy Act § 48(a)(3) a receiver conducting a debtor's business "shall receive such amount as may be allowed by the court, but in no event to exceed twice the maximum allowance permitted by paragraph (2) of this subdivision a."

**12.** It appears that the portion of the successor receiver's application seeking remaining commissions in the total, but lesser amount of $1,440.50 is in error. See application for Allowance of Final Compensation to Receiver and Payment of Expenses at 4, paragraph 4.

**13.** Although there was no provision in the 1898 Bankruptcy Act for the award of interim compensation, courts have entertained such applications "to alleviate economic hardship in protracted cases and assure the competent and efficient administration [inter alia] of the Chapter X estate." *Matter of Interstate Stores, Inc.*,

25% which amounts to $563,157.50 plus compensation for the last interim period totalling $137,660.50. In addition, these applicants seek allowance of a premium in the amount of $500,000.

## (1)
### Counsel Fees

■ Bankruptcy Rule 219(c)(1)[14] sets forth, generally, the factors to be weighed by the bankruptcy court in allowing compensation. It provides that "the Court shall give due consideration to the nature, extent, and value of the services rendered as well as to the conservation of the estate and the interests of creditors." Case law has refined these broad terms by specifically teaching that the "principal factors which enter into a determination of what is reasonable are "the time spent, the intricacy of the questions involved, the size of the estate, the opposition encountered, the results obtained and the 'economic spirit' of the Bankruptcy Act to curtail unnecessary expenses."[15] Moreover, variations upon those factors[16] as well as additions,[17] thereto,

have been suggested and explored by several courts. Unlike the prevailing practice in the First[18] and Fifth[19] circuits, however, we have not been directed to mechanically apply a checklist of enumerated factors in reaching our determination.[20] Nevertheless we must, at the very least, take into account[21] those factors just enumerated.[22]

■ Moreover, in considering an application for counsel fees we are instructed not to be moved, by the fact, as here,[23] that no objections to the application have been entered.[24]

The total request by Patterson, Belknap, exclusive of its application for a premium, amounts to $2,390,287.

The applicants, at the time of the hearing on final allowances sought here, as well as at prior hearings on interim fee applications, have offered to make available to this Court, daily and contemporaneous time records, wholly in accord with the mandate of *In re Borgenicht.*[25] The applications, in total, reflect time expenditures of 25,209.40 hours for attorneys time[26] and 3,698.05 hours for paralegals' time.[27] It appears

---

437 F.Supp. 14, 16 (S.D.N.Y.1977). Of course, the principle of "strict economy" is applicable, as well, to such applications. *Id.* at 17.

The Bankruptcy Reform Act of 1978, on the other hand, specifically authorizes, where justified, and upon stated time constraints, an award of interim compensation. 11 U.S.C. § 331.

14. 411 U.S. 1040, 93 S.Ct. 3126.

15. *In re Paramount Merrick, Inc.*, 252 F.2d 482, 485 (2d Cir. 1958).

16. *Jacobowitz v. Double Seven Corp.*, 378 F.2d 405, 408 (9th Cir. 1967).

17. *Matter of D. H. Overmyer Co., Inc., supra* at 686.

18. *King v. Greenblatt*, 560 F.2d 1024 (1st Cir. 1977). But see *Furtado v. Bishop*, 635 F.2d 915 (1st Cir. 1980).

19. *Matter of First Colonial Company of America,* 544 F.2d 1291 (5th Cir. 1977).

20. *Compare In re Hardwick & Magee Co.*, 355 F.Supp. 58, 65 (E.D.Pa.1973).

21. *In re Mabson Lumber Co.*, 394 F.2d 23, 25 (2d Cir. 1968).

22. Note 15, *supra.*

23. Transcript of Hearing on Allowances, July 14, 1981 at 20–21; 24; and 25.

24. *Cf. Matter of Hamilton Hardware Co., Inc.,* 11 B.R. 326, 329 (Bkrtcy.E.D.Mich.1981) (Bankruptcy Court) (Chapter 11 case under the 1978 Bankruptcy Code); *Cf. In re Folker,* 47 F.Supp. 522, 524 (E.D.Mich.1942) (where there was no opposition to a petition for review of allowances for counsel). See also *York International Bldg. Inc. v. Chaney,* 527 F.2d 1061, 1068 (9th Cir. 1975).

25. 470 F.2d 283, 284 (2d Cir. 1972).

26. It should be noted that each and every application submitted, for the purpose of compensation by the attorneys for the receiver, sets forth the names of the attorneys and paralegals, the hours expended by them, and the hourly rate assigned in accordance with their rank in the firm.

27. Paralegal time is compensable since it is not an overhead expense. *In re Garland Corp.*, 8 B.R. 826, 835 (Bkrtcy.D.Mass.1981).

that $2,269,336 represents the time of lawyers or an hourly charge of $90; and $120,951 represents paralegals' time and thus a charge at the rate of $32.71 an hour.

■ It has been observed by a neighboring District Court, that "[i]n the Second Circuit, . . . time spent is the dominant consideration in determining fees. . . ."[28] Although we view time spent as a major criterion in our determination, we do not agree with the learned District Judge from Pennsylvania that such factor is to be assigned the paramount role in our fee determinations. Rather, we have been instructed by the Second Circuit that time spent is not ". . . only—or even the most important factor in granting an allowance.[29] If it were otherwise, we often may, unwittingly, reward the indolent and inexperienced at the expense of the industrious and efficient.[30]

We view time spent in tandem with the results achieved and we do not find the applicants wanting, in that regard.

In particular we note: the settlements obtained by counsel with several coal lessors thus enabling the debtors to fulfill the latters' contract with their real source of operating revenue during the pendency of these cases, Dayton Power and Light Company; the extremely favorable settlement of an adversary proceeding commenced by the applicants against nine limited partnerships, seeking a declaration that the partnerships', asserted interest in coal mined by certain of the coal debtors was void; advantageous settlements with more than a dozen secured creditors where the indebtedness of the debtors to such creditors were in default; the settlement agreement with Tesoro Coal Company, the Internal Revenue Service, the Commonwealth of Kentucky, and the claim

by one Douglas N. Rice, which aggregated $1,125,000.

Obviously, these results do not reflect the necessary and varied tasks, so commendably performed by applicants, in reaching a successful confirmation here. As stated earlier, the success of applicants' efforts created the favorable atmosphere and financial ability for payment to all creditors of 100% of their allowed claims and the integration of the debtors' coal mining business with that of its financially sound and new parent, Kaneb Services, Inc.

Moreover, the thirty-eight reports filed by the receiver, as well as the itemization of services rendered by counsel to the receiver, as set forth in the instant and prior applications, bear ample testament to the worth and value of their services.

Even applying the "economic spirit" of the Bankruptcy Act of 1898 we must delicately balance that spirit with the desire to encourage competent professionals, as here, to service estates in this Court.[31]

In weighing the factors, set forth earlier, to be applied in a request for compensation, this Court, in its discretion, and from the ". . . superior position [it is in] . . . to appraise the value of the . . . [attorneys'] services for the estate. . . .[32], finds that Patterson, Belknap is entitled to reasonable compensation in the amount requested by them, $2,390,287. Their request for reimbursement, in the amount of $10,473.91, is also granted.

## (2)
### Premium

■ In addition to the allowances for counsel just awarded, Patterson, Belknap seeks an additional award of $500,000 as a "premium"[33] for what these applicants

---

**28.** Note 20, *supra* at 68.

**29.** Note 25, *supra* at 284 n.1. To be sure, it has been stated that the dominant consideration to be applied in an application for compensation varies from case to case. *In re Osofsky*, 50 F.2d 925, 927 (S.D.N.Y.1931).

**30.** Note 8, *supra* at 486.

**31.** *In re Dunnhill Suspender and Belt Corp.*, 162 F.Supp. 608, 611 (S.D.N.Y.1958).

**32.** *Carter v. Woods*, 433 F.Supp. 291, 294 (W.D.Mo.1977) (citations omitted).

**33.** We will adhere, in this opinion, to the applicants' term "premium" although such additional award of compensation has been otherwise described as a "reward", *In re Yale Express*

characterize as "spectacular results"[34] achieved by them in these Chapter XI cases.

■ We must observe, at the outset, that we discern no statutory bar, in the bankruptcy context,[35] to the awarding of a premium if justified.[36] Rather, our determination here, must be founded upon the dictates and imperatives of Bankruptcy Rule 219[37] and the factors to be employed thereunder, referred to earlier.

An objection, limited solely to applicants' request for a premium,[38] has been filed by two former owners of the coal subsidiaries of Aminex, Andrew Adams and Edward L. Clemons ("objectants"), and duly heard by this Court at the hearing on allowances.

The objectants argue that a premium is unjustified here since an allowance thereof, in addition to their "lodestar" request for compensation would represent 111% of the distribution to unsecured creditors and 67% of the maximum potential amount of all monies paid on confirmation under the plan.[39]

■ However, in my view, except as noted *infra*, the size of distribution of monies to creditors, in relation to a request for attorneys' fees, is not the proper focus for a determination of reasonableness. Rather, we have indicated that one of the factors to be applied in determining a just award of counsel fees is the "size of the estate." That term had judicially been interpreted to mean, not the size of the distribution to

*System, Inc.*, 366 F.Supp. 1376, 1385 (S.D.N.Y. 1973), a "bonus" *Matter of TMT Trailer Ferry, Inc.*, 577 F.2d 1296, 1299 (5th Cir. 1978) and *Matter of Futuronics*, 21 C.B.C. 550, 565–6 (S.D.N.Y.1979) (Bankruptcy Court), *reversed on other grounds*, 5 B.R. 489, 498 (S.D.N.Y. 1980), *aff'd* 655 F.2d 463, 80–5032–3, 80–5046, 8, 80–5050, slip op. at 4109 (2d Cir. July 2, 1981), or an "enhancement", *Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088, 1092 (5th Cir. 1980), and *Matter of Myers*, 4 B.R. 343, 345 (Bkrtcy.N.D.Fla.1980) (Bankruptcy Court).

**34.** Application for Allowance of Final Compensation, Par. 22 at 22.

**35.** A "bonus" or "an increment to the lodestar" has routinely been awarded, for example, in Title VII cases commenced under the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e—17 (1976), upon a finding of great risk and complexity of the litigation and quality of the representation. See *e. g. Cohen v. West Haven Board of Police Commissioners*, 638 F.2d 496, 505 (2d Cir. 1980), relied upon most recently by the Court in *Ross v. Saltmarsh*, 74 Civ. 5047 (S.D.N.Y. August 24, 1981). See also *Wolf v. Frank*, 555 F.2d 1213, 1218 (5th Cir. 1977) (stockholders derivative action).

**36.** We are aware of the decision in *In re Dole Company*, 244 F.Supp. 751 (D.Me.1965) which denied a premium to counsel in a successful Chapter XI case based upon the erroneous view that Bankruptcy Act § 337(2), 11 U.S.C. § 737(2), now repealed, as it read at the date of the *Dole* decision, was intended to "*discourage* the bar from undertaking Chapter XI cases which appear unpromising. "This clear congressional intent", said the court, "would be [thus] thwarted by awarding a premium to debtors' attorneys in successful Chapter XI cases ...." *id.* at 757 (emphasis in text) (cita-

tions omitted). That the court in *Dole* misconstrued the "clear congressional intent" is evident from the court's analysis in *In re Casco Fashions, Inc.*, 490 F.2d 1197, 1204 (2d Cir. 1973) which found, quite to the contrary, that "[w]e are simply unable to share the view [of *Dole*] that in passing the Chandler Act, Congress deliberately chose to make life hazardous for attorneys for debtors-in-possession, even in wholly legitimate Chapter XI proceedings [sic] . . . ." (citations omitted). The court in *Casco*, having dismantled that underpinning of *Dole's* determination, we accord no precedential value to *Dole* with respect to the availability of premiums to Chapter XI counsel. In any event, even if the rationale of *Dole* were found correct, it would not extend to counsel for a receiver in a Chapter XI case which did not "undertake" the filing of the Chapter XI petition.

**37.** 411 U.S. 1038, 93 S.Ct. 3125. *Cf. Matter of Futuronics Corp.*, 5 B.R. 489, 498 (S.D.N.Y. 1980), *aff'd* 655 F.2d 463, 80–5032–3 *etc.*, slip op. (2d Cir. July 2, 1981).

**38.** Since the allowance of compensation to attorneys, *inter alia*, including one for a premium "is peculiarly a judicial responsibility" (Advisory Committee's note to Bankruptcy Rule 219), we do not deem it necessary to address the applicants' argument that, in light of the 100% creditor payout, the objectants lack standing to enter their complaints here.

**39.** It is noteworthy that objectants did not complain that the compensation requested by the applicants, excluding the premium, amounts to 92% of the distribution to unsecured creditors and 56% of the maximum amount paid under the plan.

creditors, but rather "the total value of the estate." [40] Accordingly, viewed in relation to $20.9 million dollars, the total value of this estate, total compensation sought by counsel for the receiver, including the requested premium, amounts to almost 14% of the estate—not an unacceptable ratio. [41]

This exposition on the relationship between requested counsel fees and the total value of the estate, does not preclude consideration, urged on us by objectants, of the relationship between the requested allowance and the total distribution to general creditors. But the size of such distribution must be viewed only insofar as it "reflects their [creditors'] assessment of the financial strength of the debtor...." [42] Here, where there can be no serious dispute that the debtors, with their new parent, Kaneb Services, Inc., will emerge from the Chapter XI cases in a "healthy financial condition", [43] the size of creditor distribution may be ignored as a determining factor in our review of requests for counsel fees.

In any event, the objectants remind us, that a dominant chord, and prevading theme, of the now bygone era of 1898 Bankruptcy Act compensation requests, applica-

ble here, [44] is the "economical spirit" of that Act.

Of course, the focus of our attention in applying that "spirit", necessarily varies in accordance with the bankruptcy case involved.

In the context of a straight bankruptcy liquidation case, the caveat to be "economical", in the award of allowances, was formulated to "[r]eserve as much as possible for distribution to creditors...." [45] In other words, "the cost of bankruptcy should not itself consume the very res the proceedings are designed to protect...." [46]

In rehabilitation cases under Chapters XI, XII and reorganization cases under Chapter X, respectively, there is, in addition to the creditor body, an additional object of concern to be protected under the umbrella of "economical spirit"; the rehabilitated or reorganized entity, as the case may be. Thus in such cases, as just noted in a different context, we must be assured that the award of compensation will not be so generous as to adversely impact upon the ability of the rehabilitated debtor to emerge "in a healthy financial condition" [47] or to "impose too se-

---

**40.** *In re Goodman*, 17 F.Supp. 337 (W.D.N.Y. 1936). Of course, "the size of the estate is not the decisive or only factor to be considered in fixing the allowances of attorneys and accountants." *In re Dunnhill Suspender and Belt Co.*, note 31, *supra* at 611.

**41.** For an example of a clearly unacceptable ratio see, *e. g., In re Goodman, supra* (40 per cent of the estate). But see *Matter of F. O. Baroff Co., Inc.*, 3 C.B.C. 523 (S.D.N.Y.1976) (allowance of 16.2% of the estate as counsel fees).

**42.** *In re Dole Company*, 244 F.Supp. 751, 755 (D.Me.1965).

**43.** *Ibid.*

**44.** We are, of course, aware that the Bankruptcy Reform Act of 1978 has pointedly overruled the myriad of cases, under the former Act, "based on notions of ... economy of administration." Legislative History to 11 U.S.C. § 330, H.R.N. 95–595, 95th Cong. 1st Sess. 329–30 (1977), U.S.Code Cong. & Admin.News 1978, p. 6286. Thus, although the subject matter of bankruptcy cases may still be less "alluring" in the annals of jurisprudence, for example, than constitutional and labor law cases,

*State of New Jersey v. Reading Co.*, 451 U.S. 918, 101 S.Ct. 1997, 68 L.Ed.2d 310 (Mem.) (Rehnquist, J., dissenting), Congress sought to allure more competent counsel to the halls of this Court through the allowance of compensation in bankruptcy cases comparable to that obtainable in cases serviced outside that specialized area of law. However, since the instant cases were filed before October 1, 1979, they are "unaffected by provisions of the New Bankruptcy Act." *Matter of U. S. Golf Corp.*, 639 F.2d 1197, 1201 (5th Cir. 1981). See also *Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088, 1092 (5th Cir. 1980) (relied upon by the applicants here in another context): *In re Parr*, 3 B.R. 692, 697 n.3 (Bkrtcy.E.D.N.Y.1980); *Matter of Maidman*, 2 B.R. 569, 578–9 (Bkrtcy. S.D.N.Y.1980), *aff'd on opinion below*, 2 B.R. 18 (Bkrtcy.S.D.N.Y.1981), *appeal pending*.

**45.** 3A Collier on Bankruptcy, ¶ 62–12[5] at 148–5 (14th ed. 1975).

**46.** Note 16, *supra* at 409 (Merrill, J., dissenting).

**47.** Note 42, *supra.*

vere a financial burden"[48] upon a newly conceived reorganized company.

Are we to conclude, therefore, that where, as here, the creditor body's interests are ultimately assured by a 100% payment, and the financial strength and future of the rehabilitated debtors are secure, the "economical spirit" of the Bankruptcy Act dissolves and disappears? We think not.

Clearly Bankruptcy Rule 219 even in the instant situation, mandates that the bankruptcy court must vigilantly control fees and expenses[49] in order to ensure that allowances therefor be fixed "at the lower end of the spectrum of reasonableness."[50] But this standard does not preclude, as objectants appear to maintain, the award of a premium. If under the circumstances of a particular case the award of compensation, even if justifiably enhanced by a premium, falls within the dictates of reasonableness, the "economical spirit" of the Act has been served.[51]

We have set forth earlier, in this opinion, the extraordinary efforts and remarkable results achieved by the applicants. If we were under the circumstances present here, to deny a premium, we would impermissibly be confusing "economical" with "parsimonious" in total derogation of the spirit of the Bankruptcy Act.[52] Nevertheless, being quite aware, doubtless as are counsel for the receiver, that attorneys laboring under the Act, as public officers,[53] "cannot expect the highest of fees"[54], let alone fees comparable to those available in cases outside the precincts of this forum,[55] we award to Patterson, Belknap, as a premium, the amount of $200,000 as against their request for $500,000.[56]

## C

### Receiver's Special Kentucky Counsel

■ In this application, the Kentucky law firm of Greenbaum Doll & McDonald, appointed as special counsel to the receiver in the spring of 1978, seeks compensation for the period of May 15, 1981 through June 9, 1981, in the amount of $18,119.01.[57] Ad-

48. *In re Yale Express System*, 366 F.Supp. 1376, 1386 (S.D.N.Y.1973) (Chapter X case).

49. Note 32, *supra* at 293. *Cf. Brown v. Gerdes*, 321 U.S. 178, 181, 64 S.Ct. 487, 488–89, 88 L.Ed. 659 (1944) (Chapter X case).

50. Note 16, *supra*.

51. *Cf. Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088, 1092 (5th Cir. 1980) (involuntary bankruptcy case). Of course, where an applicant "misdirected ... [and] was positively detrimental to the progress of the case" an award of a premium would be erroneous." *Matter of TMT Trailer Ferry, Inc.*, 577 F.2d 1296, 1300 (5th Cir. 1978) (Chapter X case).

52. 3A Collier on Bankruptcy ¶ 62.12[5] at 1483–4 (14th ed. 1975).

53. *York International Bldg. Inc. v. Chaney*, 527 F.2d 1061, 1068 (9th Cir. 1975).

54. *Cf. Cle-Ware Industries, Inc. v. Sokolsky*, 493 F.2d 863, 875 (6th Cir.), *cert. denied* 419 U.S. 829, 95 S.Ct. 50, 42 L.Ed.2d 53 (1974) (maximum 20% plan to creditors).

55. *Cf.* 11 U.S.C. § 330 (1978). *Cf. In re Warrior Drilling & Engineering Co., Inc.*, 9 B.R. 841, 850–1 (Bkrtcy.N.D.Ala.1981) (1978 Bankruptcy Code Case); *In re Garland Corp.*, 8 B.R. 826, 830 (Bkrtcy.D.Mass.1981) (1978 Bankruptcy Code Case).

56. It should be noted that the applicants argue, in support of their request for a $500,000 premium, that since their interim allowances totalled only 75% of total time charges, the premium is compensation in part for "an interest free loan". Although we have been instructed that "a court need not elaborate or give reasons for rejecting claims which it regards as frivolous or totally without merit", *Sumner v. Mata*, 449 U.S. 539, 548, 101 S.Ct. 764, 770, 66 L.Ed.2d 722 (1981), we simply note that Judge Tyler wisely reasoned, in dismissing a similar argument in *In re Yale Express Systems, Inc.*, *supra* at 1382, that

> "The ... applicants in question were appointed with full recognition that they had no specific claim to any set of fees or allowances, either interim or final... The estates have not been holding vested sums for them by way of allowances or fees. In short, I conclude that ... Chapter X ... would be violated in spirit by the award of any interest for so much of the allowances which have not been paid to date."

*Compare In re Fidelity Mortgage Investors*, 12 B.R. 641 (S.D.N.Y.1981) (Weinfeld, J.).

57. This reflects lawyers charges at the hourly rates of $83.31 amounting to $17,427.50 and paralegal charges, at the hourly rate of $32.47, amounting to $691.51.

ditionally, special counsel requests allowances, in the sum of $41,619.43 for that portion of their six interim applications which was withheld by this Court until the final hearing on allowances.[58] Moreover, special counsel seeks a "premium", in the amount of $9,359.23 for extraordinary services performed by them during the course of the Chapter XI cases, noting, in particular, the favorable settlement obtained by them, on behalf of the estate, in the amount of $300,000 in a matter entitled *Aceco, Inc. v. Epling.* Finally, special counsel requests out-of-pocket disbursements in the sum of $2,468.66.

Special Counsel, based in Kentucky, the location of the Chapter XI debtors, provided significant services to the receiver in connection with the coal mining and sales operations in the area of Hazard and Lexington, Kentucky. Their services and accomplishments are well-documented both in the present and prior applications to this Court for compensation.

In applying the factors to be utilized in the review of an application for compensation under the 1898 Bankruptcy Act, set forth earlier in our analysis of the application by counsel to the receiver, we find that reasonable compensation, for purposes of the instant application, including counsel's request for a premium, is $65,000. We allow, as requested, reimbursement in the amount of $2,468.66.

### D

*Special Appellate Counsel to the Receiver*

■ By order dated June 9, 1978, this Court authorized the receiver to retain the law firm of Bradley, Campbell and Carney, as special counsel, to prosecute an appeal, on behalf of the debtor, Aminex Resources Corporation, *inter alia*, to the United States Courts of Appeals for the Tenth Circuit in a case entitled, *In the Matter of King Resources Company, et al. v. Charles A. Baer,* *et al.* Pursuant to the aforesaid order of this Court, the Receiver was authorized to expend no more than $7,500 for the appeal. As it turns out, the appeal was unsuccessful and special counsel seeks attorneys fees in the amount of $4,745 and printing costs in the sum of $598.33.

Special Counsel indicates that lawyer's time spent on the appeal amounted to 74.2 hours and 19.4 hours were charged to a legal assistant.

We find the request here reasonable as well as the out-of-pocket disbursements for printing of the brief and the debtor's share of appendix costs.

### E

*Accountants to the Receiver*

■ The accounting firm of Ernst and Whinney was retained by the receiver and approved by this Court by order dated April 11, 1978. That order was subsequently amended by orders dated October 20, 1978, March 9, 1979, October 5, 1979, September 18, 1980 and March 6, 1981. The total authorized maximum allowable compensation was set at $550,000. To date, the accountants have received, through interim grants of allowances, the sum of $395,086.40. They presently seek the sum of $131,695.60, accrued compensation not previously applied for in interim applications, and $18,881 accrued compensation for the period May 23, 1981 through June 22, 1981.[59] Additionally, applicants seek reimbursement for out-of-pocket disbursements, for which no previous application has been made, in the amount of $498.

■ The Court is aware of the substantial work rendered by the accountants in these Chapter XI cases. The familiar criteria, applicable to attorneys' requests for compensation, are relevant, as well, to accountants servicing estates in this Court.[60] These applicants, in this final request for compensation, as well as in previous interim

---

**58.** This Court has awarded to special counsel a total amount of $124,858.31, for the six interim periods.

**59.** The accountants accordingly seek, as total compensation, the amount of $545,663.

**60.** Note 31, *supra.*

requests, therefor, have set forth the rank of accountant assigned to the task and the hourly rate of each such accountant. A summary of the accounting services rendered is set forth as Exhibit "A" to the present application.

In our view, the accountants are entitled to compensation, over and above previous awards, in the amount of $144,913.60 and $498 in disbursements, as requested.

## F

### *Secretary To Creditors' Committee*

■ Bornstein Associates, pursuant to the provisions of Bankruptcy Act § 339(2) [61] and Bankruptcy Rule 11–29(b),[62] was retained as secretary to the Official Creditors' Committee. It appeared, at the hearing, that the Bornstein application, seeking $10,-000 for services rendered,[63] although filed with the Court, was not served upon the interested parties. Accordingly, this Court stated, on the record, that Bornstein would be granted one week from July 14, 1981 within which to serve its application and that only in the event that there was a request for a hearing on that application, would I direct such hearing in lieu of a mere submission to the Court.[64]

Counsel for the receiver has filed an objection to the Bornstein application and seeks a hearing.

Since a secretary's compensation is based on time and because "purported expert testimony on the value of administrative serv-ices rendered by a secretary of a creditors' committee would certainly be conjectural at best, if not downright spurious",[65] upon reflection, this Court sees no reason to hold a hearing provided that Bornstein Associates supplements its application as we now suggest.

Receiver's counsel quite properly observes, in its objection, that an application by an agent of the Creditors' Committee "shall be governed by Bankruptcy Rule 219." [66] This means, at the very least, that such application indicate the hours spent and the applicants' assigned charges per hour.[67] Finally, although local bankruptcy rule 16(a), *inter alia*, has been abrogated,[68] a statement should be included, within the letter and spirit of Bankruptcy Rule 219(d) that no fee sharing arrangement has been entered into by the applicant.

If Bornstein Associates submits and serves a supplemental application in conformity with the foregoing suggestions, within ten (10) days after entry of this opinion-order, no further hearing will be required. Failure to provide such supplemental hearing will necessitate a hearing on a date to be fixed by this Court.

## G

### *Summary*

For the reasons stated, applicants are awarded the following final allowances for services performed in the Aminex Chapter XI cases.

---

**61.** 11 U.S.C. § 739(2) (repealed).

**62.** 415 U.S. 1022, 94 S.Ct. 3247.

**63.** Clearly "[t]he compensation for the services of a secretary should be nominal and based upon a time basis." *Matter of Inland Systems, Inc.*, 6 C.B.C. 759, 764 (S.D.Ohio 1975) (Bankruptcy Court).

**64.** Transcript of Hearing on Allowances, July 14, 1981 at 70.

**65.** *Matter of Inland Systems, Inc., supra* note 63.

**66.** Bankruptcy Rule 11–29(c).

**67.** Bankruptcy Rule 219(a)

**68.** See *e. g.*, note 6, *supra*.

| Applicant | Final Allowance (including premium where applicable) | Interim Allowances Previously Paid | Balance | Disbursements |
|---|---|---|---|---|
| Rudolph W. Guiliani Harold R. Tyler, Jr. | $ 240,930.00 | $ 176,189.08 | $ 64,740.92 | $ 34.56 |
| Patterson, Belknap, Webb & Tyler | 2,590,287.00 | 1,689,469.00 | 900,818.00 | 10,473.91 |
| Greenbaum Doll & McDonald | 189,858.31 | 124,858.31 | 65,000.00 | 2,468.66 |
| Bradley, Cambell & Carney | 4,745.00 | – 0 – | 4,745.00 | 598.33 |
| Ernst & Whinney | 540,000.00 | 395,086.40 | 144,913.60 | 498.00 |

SO ORDERED.